IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-01319-PAB-MJW

ROBERT ALVAREZ and
GEORG-ANDREAS POGÁNY,

      Plaintiffs,

v.

COL DAVID GROSSO, in his official capacity,
SGM MARK COOK, in his official capacity,
COL JOHN IRGENS, in his official capacity,
LTG JOSEPH ANDERSON, in his official capacity, and,
COL JOEL HAMILTON, in his official capacity,

      Defendants.

---

### ORDER

---

    This matter is before the Court on the Motion to Dismiss [Docket No. 41] pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by defendants Colonel David Grosso, Sergeant Major Mark Cook, Colonel John Irgens, Lieutenant General Joseph Anderson, and Colonel Joel Hamilton.  Plaintiffs filed this lawsuit to rescind an order of the commander of Fort Carson barring plaintiffs from the military installation.

## I.  BACKGROUND[1]

    In 2008, plaintiffs Robert Alvarez and Georg-Andreas Pogány began providing pro bono investigative and advocacy services to U.S. Army service members facing administrative and judicial proceedings at the U.S. Army installation at Fort Carson,

---

[1]The following facts, unless otherwise indicated, are taken from plaintiffs' amended complaint and are presumed true for purposes of resolving this motion.

which is located in El Paso County, Colorado.  Docket No. 36 at 3, ¶ 10.  Plaintiffs'

services included providing case analysis, seeking correction of health care records

and/or additional medical evaluations, communicating with clients' superiors,

investigating allegations underlying improper conduct discharges, and providing trial

support services.  *Id.* at 3-4, ¶ 10.  The majority of plaintiffs' clients suffer from mental

illness precipitated by service-related traumatic brain injury ("TBI") and/or post-traumatic

stress disorder ("PTSD").  *Id.* at 4, ¶ 11.  Plaintiffs work together and sometimes with

attorneys representing service members.  *Id.* at 5, ¶ 12.  The nature of plaintiffs'

advocacy work requires base access, including an opportunity to interview military

personnel, *see id.* at 5-6, ¶¶ 14-15, and attend courts martial and administrative

hearings, which were held on Fort Carson.  *Id.* at 5, ¶ 14.  In providing their pro bono

services, plaintiffs conducted themselves professionally and with respect for military

order and discipline.  *Id.* at 6, ¶ 16.  When plaintiffs were unable to resolve

disagreements with Fort Carson command staff regarding their clients, plaintiffs

reported such disagreements to the Office of the Surgeon General of the U.S. Army, to

the Vice-Chief of the U.S. Army, and to senators and congressional representatives.  *Id.*

at 7, ¶ 19.  Plaintiffs also requested Army Regulation 15-6 investigations of Fort Carson

physicians and commanders for interference in plaintiffs' clients' medical evaluations

and separation proceedings.  *Id.*

Col. Grosso, Col. Irgens, Sgt. Cook, and Lt. Gen. Anderson were all part of Fort

Carson's command staff in 2012.  *Id.* at 1-2, ¶¶ 2-3.  Col. Grosso was the Garrison

Commander of Fort Carson in 2012.  *Id.* at 6, ¶ 16.[2]  In late 2011, plaintiffs identified an increase in the military's use of adverse discharge proceedings to expel servicemembers who should have been released through medical disposition due to service-related injuries.  *Id.* at 6-7, ¶ 17.  In early 2012, Sgt. Cook, on behalf of Col. Irgens and Lt. Gen. Anderson, invited plaintiffs to collaborate with Fort Carson staff in identifying soldiers whose misconduct was caused by service-related injuries.  *Id.*  With the exception of Col. Hamilton, defendants were members of a group called the Tiger Team "formed by LTG ANDERSON ostensibly to ensure that complicated cases have all matters fully considered prior to being brought before him or his subordinate commanders for decision."  *Id.* at 10, ¶ 24.

In March and April 2012, plaintiffs communicated with defendants regarding the discharge of Spc. Nesbett, one of plaintiffs' clients.  Docket No. 36 at 8, ¶¶ 20-21. Plaintiffs asked Lt. Gen. Anderson to suspend separation activity on Spc. Nesbett's case.  *Id.*  Sgt. Cook responded on Lt. Gen. Anderson's behalf, asserting that discharge proceedings were proper.  *Id.*  Plaintiffs then advised Lt. Gen. Anderson that they would take their concerns to the Senate Veterans Affairs Committee and Senate Armed Services Committee.  *Id.*  Lt. Gen. Anderson suspended separation proceedings for Spc. Nesbett.  *Id.*

Plaintiffs continued their work through the summer and fall of 2012.  During that time, plaintiffs represented Spc. Bettencourt, a soldier facing adverse discharge as a result of misconduct.  Docket No. 36 at 10, ¶ 24.  Plaintiffs believed that such

---

[2]Col. Hamilton took over as Garrison Commander of Fort Carson in May 2014. *Id.* at 2, ¶ 3.

misconduct was caused by a service-related injury and contacted the Tiger Team,

requesting that the defendants suspend the discharge proceedings and process Spc.

Bettencourt for medical disposition. *Id.* Although defendants temporarily suspended

discharge proceedings, on October 23, 2012, those proceedings resumed. *Id.* at 10,

¶ 25. However, Col. Irgens advised plaintiffs that the Tiger Team would continue to

receive their input, stating

> [w]e hope that you will continue to provide information to the Tiger Team
> regarding perceived problems with systems used by the Installation, and
> specific injustices you believe are happening to individuals Soldiers . . . Your
> input regarding issues is valued, as this Installation and its Commanders
> care deeply about Soldiers. They are highly interested in looking into any
> matter that might be perceived as or actually does deprive a Soldier of any
> fairness. Please feel free to notify the Tiger Team of all issues.

*Id.*

On October 27, 2012, plaintiffs asked Lt. Gen. Anderson to suspend Spc.

Bettencourt's discharge. *Id.* at 11, ¶ 26. On October 30, 2012, Sgt. Cook invited

plaintiffs "to present issues that you would like the Tiger Team to look into" at a Tiger

Team meeting on November 1, 2012. *Id.* at 12, ¶ 29. On October 31, 2012, plaintiffs

emailed Lt. Gen. Anderson, expressing concern that Lt. Gen. Anderson's subordinates

were violating Article 134 of the Uniform Code of Military Justice, including "wrongful

interference with an adverse administrative proceeding," and notifying Lt. Gen.

Anderson that they intended to approach the Armed Services Committee to seek

intervention on behalf of Spc. Bettencourt. *Id.* at 11, ¶ 27. On October 31, 2012, Mr.

Alvarez accompanied Spc. Bettencourt through his out-processing from Fort Carson.

*Id.* at 12, ¶ 28. Mr. Pogany was not physically present. *Id.* Midway through the out-

4

processing, the proceeding was halted because of a telephone call from Spc.

Bettencourt's physician, who ordered Spc. Bettencourt's discharge halted for further

medical evaluation.  *Id.*

On November 5, 2012, Col. Grosso issued a debarment order (the "debarment

order") preventing plaintiffs from entering Fort Carson.  *Id.* at 12, ¶ 30.  Col. Grosso

notified plaintiffs of the decision via a letter, which stated, "I have determined that your

presence is disruptive to the good order and discipline of the Fort Carson installation.

You are hereby ordered not to reenter or be found within the limits of Fort Carson,

Colorado."  See Docket No. 41-1; Docket No. 41-2.[3]  The letter explained that plaintiffs

could submit a written statement requesting modification or rescission of the debarment

order.  *Id.*  Plaintiffs sought reversal of the debarment order by higher authorities.  *Id.* at

13-14, ¶ 34.  In response to plaintiffs' appeal to higher authorities, defendants provided

specific reasons for issuing the debarment order, including that plaintiffs had physically

interfered with the out-processing of Spc. Bettencourt and had told "a solider to 'drool'

and otherwise falsify symptoms of mental illness in order to justify medical disposition

and evade bad conduct discharge proceedings."  *Id.* at 13-14, ¶ 34.  Plaintiffs claim that

such statements are false.  *Id.*

On May 12, 2014, plaintiffs filed this case against defendants in their individual

and official capacities.  Docket No. 1.  On September 22, 2014, plaintiffs filed an

amended complaint asserting claims for First Amendment retaliation, violation of due

---

[3]Because these documents are referenced in plaintiffs' complaint and are central
to their claims, the Court can consider them without converting the present motion to a
motion for summary judgment.  *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215
(10th Cir. 2007).

process, and violation of First Amendment right of access to courts.  *Id.* at 15, 17, 19.

On October 7, 2014, the Court dismissed with prejudice all claims against defendants in

their individual capacities.  Docket No. 40 at 1.  Plaintiffs are seeking declaratory and

injunctive relief vacating the debarment order.  Docket No. 36 at 21, ¶ 57.

## II.  STANDARD OF REVIEW

The Court's function on a Rule 12(b)(6) motion for failure to state a claim upon

which relief can be granted is not to weigh potential evidence that the parties might

present at trial, but to assess whether the plaintiff's complaint alone is sufficient to

plausibly state a claim.  Fed. R. Civ. P. 12(b)(6); *see also Dubbs v. Head Start, Inc.*,

336 F.3d 1194, 1201 (10th Cir. 2003).  In doing so, the Court "must accept all the well-

pleaded allegations of the complaint as true and must construe them in the light most

favorable to the plaintiff."  *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir.

2007) (quotation marks and citation omitted).  At the same time, however, a court need

not accept conclusory allegations.  *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d

1227, 1232 (10th Cir. 2002).

To survive a motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6), a complaint

must allege enough factual matter that, taken as true, makes the plaintiff's "claim to

relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th

Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the

well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled

to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and

alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 (quoting *Twombly*, 550 U.S. at 570) ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss."). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted).

## III.  ANALYSIS

A key to the resolution of defendants' motion is the location on which plaintiffs' alleged activities principally occurred – a military base. It is also important to keep in mind what action of defendants plaintiffs challenge – an order barring them from Fort Carson – and what relief plaintiffs seek – rescission of the debarment order.

Base commanders have considerable discretion to exclude civilians from military bases. In fact, the Supreme Court has noted the "historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command." *Cafeteria & Restaurant Workers Union, Local 473, AFL-CI0 v. McElroy*, 367 U.S. 886, 893 (1961); *see also United States v. Albertini*, 472 U.S. 675, 690 (1985); *Greer v. Spock*, 424 U.S. 828, 838 (1976); *United States v. Gourley*, 502 F.2d 785, 786-87 (10th Cir. 1973) ("[It is] well recognized that the commander of a military installation has and must have the broad authority and discretion to summarily exclude persons

7

therefrom."). Such power comes principally from the Constitution, which grants Congress "plenary authority . . . 'To raise and support Armies'; 'To provide and maintain a Navy'; and 'To make Rules for the Government and Regulation of the land and naval Forces.'" *Chappell v. Wallace*, 462 U.S. 296, 301 (1983) (citing U.S. Const. Art. I, § 8, cls. 12-14); *see also Cafeteria Workers*, 367 U.S. 890 ("The control of access to a military base is clearly within the constitutional powers granted to both Congress and the President"). "'Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Chappell*, 462 U.S. at 301. As a result, in cases arising in the context of Congress' authority over national defense and military affairs, "perhaps in no other area has the Court accorded Congress greater deference." *See Rostker v. Goldberg*, 453 U.S. 57, 64-65 (1981); *see also Albertini*, 472 U.S. at 689. The Supreme Court has, however, suggested that civilians may not be excluded from a military base "if the announced grounds for . . . exclusion [are] patently arbitrary or discriminatory." *See Cafeteria Workers*, 367 U.S. at 898.

Although invoking different constitutional rights, each of plaintiffs' claims seeks the same thing: an opportunity to challenge defendants' stated reasons for issuing the debarment order.

## A. Due Process

Plaintiffs argue that, by issuing the debarment order, defendants violated plaintiffs' procedural and substantive due process rights. *See* Docket No. 36 at 17-18, ¶¶ 42-46.

8

Ordinarily, courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the [government]; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal citations omitted); *see also Ward v. Anderson*, 494 F.3d 929, 934 (10th Cir. 2007).   Defendants argue that plaintiffs have not established either prong, Docket No. 41 at 13, and plaintiffs do not directly respond.  The Court agrees with defendants.

As to the first prong, plaintiffs do not identify any "statute, regulation, or contract" that establishes their entitlement to continued admission to Fort Carson, *see Serrano Medina v. United States*, 709 F.2d 104, 108 (1st Cir. 1983), or identify any recognized basis for overriding a base commander's "broad authority and discretion to summarily exclude persons" from military installations.  *See Gourley*, 502 F.2d at 786.  In light of *Cafeteria Workers* and its progeny, the Court finds no basis for concluding that plaintiffs have established a property or liberty interest which the debarment order interferes with.

As to the second prong, where, as here, a private interest can be characterized "as a mere privilege subject to the Executive's plenary power, it has traditionally been held that notice and hearing are not constitutionally required." *Cafeteria Workers*, 367 U.S. at 895.  Courts interpreting *Cafeteria Workers* generally conclude that a commanding officer does not violate a civilian's due process rights by summarily excluding him or her from a military base without notice and a hearing.  *See Serrano*

*Medina*, 709 F.2d at 108 (collecting cases).  The Court therefore rejects plaintiffs' claim that they were entitled to "notice and the opportunity to be heard" before being excluded from Fort Carson.  *See* Docket No. 36 at 18, ¶ 45.[4]

Plaintiffs' argument in support of their due process claims is that the debarment order was "patently arbitrary . . . as retaliation for Plaintiffs' advocacy and reporting of misconduct in the disposition of wounded soldiers' medical and legal cases."  Docket No. 44 at 13.  The Supreme Court has stated, in dicta:

> We may assume that Rachel Brawner could not constitutionally have been excluded from the Gun Factory if the announced grounds for her exclusion had been patently arbitrary or discriminatory – that she could not have been kept out because she was a Democrat or a Methodist.  It does not follow, however, that she was entitled to notice and a hearing when the reason advanced for her exclusion was, as here, entirely rational and in accord with the contract with M & M.

*Cafeteria Workers*, 367 U.S. at 898.  Courts have interpreted this language as placing a limit on a base commander's otherwise unfettered discretion to exclude civilians from military installations.  *See Berry v. Bean*, 796 F.2d 713, 717 (4th Cir. 1986); *see also Tokar v. Hearne*, 699 F.2d 753, 757 (5th Cir. 1983).  Some courts, however, have grappled with the question of how such a limitation should be applied, including whether a plaintiff invoking this limitation is entitled to challenge the factual basis for a base

---

[4]The letters notifying plaintiffs of the debarment order give plaintiffs the option of providing a written statement to Col. Grosso requesting modification or rescission of the debarment order.  *See* Docket Nos. 41-1 and 41-2.  It is not clear that plaintiffs availed themselves of the opportunity.  However, plaintiffs allege that they "sought reversal of and investigation of the debarment order by other and higher authorities."  Docket No. 36 at 13-14, ¶ 34.  Although plaintiffs' attempt to have the debarment order rescinded was unsuccessful through military channels, the fact that plaintiffs had (and apparently exercised) some right to recourse further undercuts their assertion that they were not given sufficient procedural protections.

commander's stated reasons for exclusion. *See Berry*, 796 F.2d at 717; *Serrano Medina*, 709 F.2d at 109. The court in *Serrano Medina*, in considering this issue, looked to the Supreme Court's language in *Cafeteria Workers*:

> *Cafeteria Workers* indicates that the factual basis behind the commander's allegations is not subject to judicial scrutiny. The Court was not willing to look behind the "*announced* grounds" for the exclusion; it upheld the exclusion because "the *reason advanced*" was "entirely rational." Thus, *Cafeteria Workers* would seem, at most, to allow us only to question whether the allegations, assumed to be true, are such as would constitutionally permit an exclusion order to stand; that is, whether the assumed facts may constitutionally be the basis for judgment that [plaintiff] merits exclusion.

*Id.* (citations and quotations omitted, emphasis in original) (quoting *Cafeteria Workers*). *see also Berry*, 769 F.2d at 717 (finding considerable support for the view that a court reviewing a commander's bar order "may consider only whether it states facially valid reasons for exclusion, with no scrutiny of the factual basis for the exclusion"); *Garrison v. United States*, 688 F. Supp. 1469, 1475 (D. Nev. 1988) (deciding on motion to dismiss that "bar order issued to Garrison was based on legitimate grounds, in keeping with the broad discretion granted the base commander" (citing *Serrano Medina*)).

In *Weissman v. United States*, 387 F.2d 271, 272-73 (10th Cir. 1967), the base commander at Fort Sill in Oklahoma received reports that defendants were verbally disrupting a court-martial proceeding. The commander issued a bar order, preventing defendants from reentering Fort Sill. *Id.* Shortly thereafter, defendants were found on the base and were charged with and convicted of violating 18 U.S.C. § 1382. *Id.* On appeal, defendants challenged the bar order, arguing that the government showed no valid reason for its promulgation. The Tenth Circuit disagreed. The commander, General Brown, testified that he issued the bar order on the basis of reports of

11

defendants' behavior and because he considered the conduct of the defendants "prejudicial to good order and discipline, and the accomplishment of my mission." *Id.* at 274.  On the basis of the commander's stated reasons for issuing the bar order, the Tenth Circuit concluded that the order was reasonable.  Moreover, the court added that, "[e]ven if we did not so believe, the order was within the discretionary power of the commandant and not reviewable by the courts." *Id.*  Defendants also argued that they were entitled to production of the written reports relevant to the commander's testimony, but the Tenth Circuit disagreed, holding, "[a]s a matter of law there may be no challenge to the General's statement of the reason for the bar order." *Id.*; *see also United States v. May*, 622 F.2d 1000, 1006 (9th Cir. 1980) (noting that scope of review in challenge to bar order "extremely limited").

Some courts appear willing to examine the factual predicate of a base commander's stated reasons. *See, e.g.*, *Tokar v. Hearne*, 699 F.2d 753, 757 (5th Cir. 1983) (upholding bar order after district court bench trial, concluding "there was ample evidence to support Colonel Hearne's actions"); *Serrano Medina*, 709 F.2d at 109-10 (collecting cases).  Nonetheless, the Court is persuaded by the reasoning of *Weissman* and *Serrano Medina*.  Such reasoning is consistent with *Cafeteria Workers* and the deference courts traditionally afford base commanders to manage a military installation.  As the First Circuit has pointed out, to conclude otherwise and "delve into the truth or falsity of the facts behind the exclusion would be to require the very hearing that appellant has been found not entitled to." *See Serrano Medina*, 709 F.2d at 109.

Here, plaintiffs have failed to state a claim that defendants' stated reasons for

issuing the debarment order are patently arbitrary or discriminatory.  In the November 5,

2012 letters to plaintiffs, Col. Grosso states "I have determined that your presence is

disruptive to the good order and discipline of the Fort Carson installation."  *See* Docket

No. 41-1 at 1.  Courts have upheld bar orders issued under similar reasoning, *see, e.g.*,

*Weissman*, 387 F.2d at 274, and such reasoning appears to fall well within Col.

Grosso's discretion to summarily exclude civilians from a military installation.  *See*

*Gourley*, 502 F.2d at 786-87.  The Court therefore finds that plaintiffs have failed to

state a claim that the debarment order was patently arbitrary or discriminatory.

Although it is far from clear that defendants were required to state additional

reasons for excluding plaintiffs from Fort Carson, defendants nevertheless did so.

Plaintiffs' complaint states that, after plaintiffs challenged the debarment order with

"higher authorities," defendants offered specific reasons for the debarment order,

including that Mr. Alvarez and Mr. Pogany physically interfered with the out-processing

of SPC Bettencourt and told "a solider to 'drool' and otherwise falsify symptoms of

mental illness in order to justify medical disposition and evade bad conduct discharge

proceedings."  Docket No. 36 at 13-14, ¶ 34.  Plaintiffs adamantly deny these

accusations, *id.*, but the Court's review is not concerned with whether there is sufficient

factual support for defendants' stated reasons.  *See Garrison*, 688 F. Supp. at 1475

(assuming, without deciding, that plaintiff was correct that bar order was issued without

sufficient factual investigation, "the factual basis behind the commander's allegations is

not subject to judicial scrutiny"); *see also Serrano Medina*, 709 F.2d at 109; *Weissman*,

387 F.2d at 274.  Plaintiffs further assert that defendants' post-hoc articulation of additional grounds for the debarment order renders such grounds inherently suspect. *Id.*  It is not clear, as noted above, that plaintiffs were entitled to additional explanation of the grounds for the bar order.  Moreover, the Court finds nothing patently arbitrary or discriminatory about defendants' more specific reasons for excluding plaintiffs from Fort Carson.  Col. Grosso undoubtedly has an interest in assuring that civilians are not physically interfering with the out-processing of a service member from the base.  The other reason that plaintiffs cite in the complaint is that plaintiffs were coaching a witness to falsify symptoms of mental illness to gain an advantage in discharge proceedings. Plaintiffs do not dispute that, if true, this would constitute serious misconduct.  Col. Grosso's decision to exclude plaintiffs for those reasons is facially rational, and plaintiffs do not otherwise identify a sufficient basis for the Court to interfere in what is a facially legitimate exercise of discretion.  *See Albertini*, 472 U.S. at 689 (noting that analysis of bar order "does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests"); *Chappell*, 462 U.S. at 301.[5]

---

[5]Plaintiffs rely on *Robinson v. Overseas Military Sales Corp.*, 827 F. Supp. 915 (E.D.N.Y. 1993), for the proposition that defendants exceeded their discretion in issuing the debarment order because they did not issue the order based upon a "rational reason."  In *Robinson*, the plaintiff was employed by a private company to sell cars at a United States military installation in Korea.  *Id.* at 919.  The U.S. Army investigated allegations plaintiff sold goods on the black market to Korean nationals and improperly purchased rations at a military base.  *Id.*  Based on a report of such investigation, the base commander barred plaintiff from military bases in Korea and, as a result, plaintiff was terminated from his job.  *Id.* at 919-20.  Plaintiff filed suit against his employer as

This reasoning applies with equal force to plaintiffs' substantive due process claim.  The substantive due process doctrine has two strands: "One strand protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience."  *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008).  Plaintiffs' allegations arise out of the latter strand.  *See* Docket No. 44 at 12.  To constitute conscience shocking behavior, the government action must be "arbitrary and unrestrained by the established principles of private right and distributive justice."  *Seegmiller*, 528 F.3d at 767 (quotation marks and citations omitted).  The Supreme Court has made clear that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  In light of commanding officers' broad discretion to summarily exclude civilians from a military base and the grounds identified as the reasons for the debarment order here, defendants' issuance of the debarment order falls well short of conscience shocking behavior.  *See Albertini*, 472 U.S. at 690; *Serrano Medina*, 709 F.2d at 109.

---

well as other defendants affiliated with the government alleging that the investigation had caused him to lose his job.  *Id.* at 920.  As to his claim that the government defendants' actions constituted a property deprivation in violation of the due process clause, the court found his argument frivolous because he had no property interest in his job.  *Id.* at 924.  The court rejected plaintiff's argument that the government should have presented him with its investigation findings prior to barring him from bases, concluding that plaintiff was not entitled to a hearing "where that officer relied on a rational reason for the debarment."  *Id.* (citing *Cafeteria Workers*).  Although *Robinson* was decided on summary judgment, its reasoning applies here.  *See Garrison*, 688 F. Supp. at 1475.

## B.  First Amendment Retaliation

Plaintiffs' complaint alleges that the debarment order violates their First Amendment rights to "freedom of speech, freedom of association and freedom from retaliation for protected conduct."  Docket No. 36 at 16, ¶ 40.  Plaintiffs, however, appear to have abandoned their freedom of speech and association theories, proceeding exclusively on a retaliation theory.  Docket No. 44 at 9-10.  Plaintiffs contend that this case "should be analyzed by answering whether a commander's discretion to exclude civilians covers debarments ordered as retaliation for protected conduct."  *Id.* at 2.

To bring a First Amendment retaliation claim outside the employment context, a plaintiff must establish three elements:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Leverington v. City of Colo. Springs*, 643 F.3d 719, 729 (10th Cir. 2011) (quotations omitted).  As to the first element, plaintiffs allege that they engaged in a variety of protected activity, including engaging in advocacy work on Fort Carson, communicating with defendants regarding soldiers' separation proceedings, and communicating with the Office of the Surgeon General and Inspector General of the United States Army as well as senators and congressmen regarding investigative findings.  Docket No. 36 at 16, ¶ 39; *see also id.* at 7, ¶ 19.  Plaintiffs appear to take the position that such conduct

is constitutionally protected petitioning activity.  Docket No. 44 at 10; *see also Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007) ("a private citizen exercises a constitutionally protected First Amendment right *anytime* he or she petitions the government for redress" (emphasis in original)).  However, by abandoning their freedom of speech and association theories, plaintiffs all but concede that they have no absolute First Amendment right to engage in speech within the confines of Fort Carson.  *See Greer*, 424 U.S. at 836 ("the First Amendment [has] never meant that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please").  In fact, plaintiffs do not explicitly challenge defendants' argument that plaintiffs have not alleged any facts entitling them to engage in First Amendment activity within Fort Carson.  Docket No. 41 at 10.

Plaintiffs' position on this issue is problematic to the success of their claim, given that they seek an order from this Court restoring their ability to enter Fort Carson.  By conceding that they have no First Amendment right to engage in speech within Fort Carson, the only conduct giving rise to this claim would appear to be petitioning activity that took place in the form of phone calls, letters, or emails outside Fort Carson.[6]

---

[6]Plaintiffs identify their protected activity as "reporting to higher authorities the efforts to subject solders to adverse administrative separation" and "advocacy against the United States Army's pattern and practice of reducing its ranks by 'chaptering' soldiers with service-related injuries."  Docket No. 44 at 10 (citing Docket No. 36 at 17, ¶ 40).  Plaintiffs do not explicitly allege that their reports to higher authorities or their advocacy against the U.S. Army – as distinguished from their representation of specific clients – occurred on Fort Carson or that their physical presence on Fort Carson was necessary to conduct such petitioning activity.  Rather, plaintiffs seems to allege that the petitioning activity is incident to and necessary for their representation of service

Plaintiffs' claim that defendants' decision to exclude them from Fort Carson was in retaliation for such activity and that this alleged retaliatory motive is grounds for vacating the debarment order.  *See* Docket No. 36 at 21.

Although styled differently, plaintiffs' First Amendment retaliation claim and due process claims seek to rescind the debarment order by the same means, namely, through a challenge to the factual sufficiency of Col. Grosso's stated reasons for issuing the debarment order.  The Supreme Court has reiterated that a commanding officer's power to exclude civilians from a military base is not subject to the same analysis as government regulation over other spaces, whether the challenge to that power is asserted under the First Amendment, *see, e.g.*, *Albertini*, 472 U.S. at 688, or the Due Process Clause.  *See, e.g.*, *Cafeteria Workers*, 367 U.S. at 895.  If a base commander's authority to exclude civilians prohibits a court from "delv[ing] into the truth or falsity of the facts behind the exclusion" when reviewing a due process claim, *see Serrano Medina*, 709 F.2d at 109,[7] that rationale would appear to apply with equal force

members.  Given that the debarment order does not prevent them from engaging in such petitioning activity, plaintiffs apparently claim that a debarment order cannot have the indirect effect of interfering with the effectiveness of their petitioning activity.

[7]*Serrano Medina* states that the "arbitrary or discriminatory" standard for overturning a bar order on due process grounds may be inapplicable "if it appeared that appellant had been excluded for the exercise of first amendment or other constitutional rights."  709 F.2d at 109 (citing *Flower v. United States*, 409 U.S. 197 (1972); *Kiiskila v. Nichols*, 433 F.2d 745 (7th Cir. 1970) (en banc).  This statement does not, however, suggest a different result here.  The Supreme Court's holding in *Flower* was predicated on First Amendment activity that occurred on an open street, where the military had "abandoned any claim that it has special interests in who walks, talks, or distributes leaflets on the avenue."  407 U.S. at 198.  In those circumstances, a base commander

18

to a court reviewing a First Amendment retaliation claim.  *See Albertini*, 472 U.S. at 689

(rejecting notion that First Amendment claim assigned the judiciary "the authority to

manage military facilities throughout the Nation").  Allowing plaintiffs to test the factual

sufficiency of Col. Grosso's stated reasons for excluding them, as noted above, would

be to grant plaintiffs the very hearing they are not otherwise entitled to.  *See Serrano*

*Medina*, 709 F.2d at 109; *Berry*, 796 F.2d at 718 (concluding that, where facts stated in

bar order were undisputed, court need not, as plaintiff urged, consider bar order "in view

of all the circumstances surrounding the order"); *Weissman*, 387 F.2d at 274.

As a result, the Court limits its analysis of plaintiffs' First Amendment retaliation

claim to determining whether defendants' stated reasons for excluding plaintiffs from

Fort Carson are patently arbitrary, discriminatory, or retaliatory.  Col. Grosso's initial

stated reason for excluding plaintiffs does not patently implicate plaintiffs' First

Amendment rights, *compare* Docket Nos. 41-1 and 41-2, *with Kiiskila*, 433 F.2d at 747,

and appears to fall well within his authority as commander of Fort Carson.  *See*

*Weissman*, 387 F.2d at 274.  Moreover, defendants' subsequently stated reasons for

the debarment order are related to plaintiffs' interference with activities taking place

within Fort Carson and do not patently implicate plaintiffs' alleged protected petitioning

---

could "no more order petitioner off this public street because he was distributing leaflets than could the city police order any leaflete(e)r off any public street."  *Id.*; *see also Greer*, 424 U.S. at 836.  In *Kiiskila*, the Seventh Circuit found that a base commander's bar order violated plaintiff's First Amendment rights and directed that plaintiff be readmitted to the base.  433 F.2d at 751.  In *Kiiskila*, however, the ability to challenge the factual basis of a base commander's reasons for a bar order was assumed.  *Id.* at 747.

activity.  *See* Docket No. 36 at 14, ¶ 34.  For the reasons discussed above, the Court

will not inquire into the truth or falsity of these reasons.  *See Weissman*, 387 F.2d at

274.  Because these reasons are not arbitrary, discriminatory, or retaliatory, defendants'

motion to dismiss as to plaintiff's First Amendment retaliation claim will be granted.

### C.  Access to Courts Martial

Plaintiffs claim that the debarment order violates their First Amendment right of

access to military courts martial held within the boundaries of Fort Carson.  Docket No.

44 at 13-14.

First, plaintiffs argue that they have a right to assist counsel and testify at courts

martial and administrative hearings on behalf of their clients.  *Id.* at 14.  Plaintiffs do not,

however, identify any authority in support of their claim that non-attorneys have a right

to "assist" in courts martial and no such authority is apparent to the Court.  Moreover,

plaintiffs are not attorneys, they work on a "pro bono" basis, and they are not

themselves a party to any court proceedings taking place on Fort Carson.  Thus, any

injury caused by their inability to assist in courts martial would be suffered by plaintiffs'

clients, not plaintiffs.  Plaintiffs therefore fail to establish that they have standing to bring

such a claim.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528

U.S. 167, 180-81 (2000) (setting forth requirements of constitutional standing).[8]

---

[8]Plaintiffs cite *Williams v. Stewart*, 441 F.3d 1030 (9th Cir. 2006), in support of
their argument that they have a right to provide trial and investigative services at courts
martial held on Fort Carson.  Docket No. 44 at 14.  However, in *Williams*, a criminal
defendant sought post-conviction relief, arguing that he was unconstitutionally denied
the appointment of a mitigation investigator.  *Williams*, 441 F.3d at 1053.  The Ninth

Second, plaintiffs argue that, because courts martial are open to the public, they have a right to attend courts martial in person.  Docket No. 44 at 14-15.  The Supreme Court has expressly rejected such logic.  *See Albertini*, 472 U.S. at 687 (holding that "valid bar letter distinguished [an individual] from the general public and provided a reasonable grounds for excluding him from the base," which "did not become less weighty when other persons were allowed to enter"); *Greer*, 424 U.S. at 838 n.10 ("The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not of itself serve to convert Fort Dix into a public forum or to confer upon political candidates a First or Fifth Amendment right to conduct their campaigns there."). Moreover, in *United States v. McVeigh*, 106 F.3d 325, 336 (10th Cir. 1997), the Tenth Circuit held that, although the Supreme Court has recognized a "public trial-access right," there exists no individual right to attend a particular proceeding:

> In our view, recognition of such an entitlement, arguably affording a constitutional basis for disruptive interlocutory review in every criminal prosecution at the behest of any disappointed would-be trial attendee, would entail an unprecedented expansion/transformation of the public trial-access right unwarranted by the policies cited by the Supreme Court as the rationale for gleaning the right from the First Amendment.

*Id.* at 335.  The Court will therefore grant defendants' motion to dismiss as to plaintiffs' third claim for relief.

---

Circuit held that, in appropriate circumstances, the Due Process Clause requires a court to "provide investigative help to ensure that an accused has received the effective assistance of counsel."  *Id.  Williams* does not, despite plaintiffs' urging, suggest that an investigator can bring suit to enforce a criminal defendant's right to investigative assistance.

**IV.  CONCLUSION**

For the foregoing reasons, it is

**ORDERED** that defendants' Motion to Dismiss [Docket No. 41] is **GRANTED**.  It is further

**ORDERED** that this case is dismissed in its entirety.


DATED September 29, 2015.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge